IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL DERMO, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JERRY ISAACSON, | : | NO.   11-06520 |
| SPRING CREEK HOLDINGS, LLC | : | |
| DEDICATED FOODS, LLC, and | : | |
| TARGET FOODS, LLC, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                                                   August 21, 2012

Currently pending before the Court is the Motion of Plaintiff Michael Dermo ("Dermo" or "Plaintiff") for Partial Summary Judgment Against Defendant Spring Creek Holdings LLC. For the following reasons, the Motion is denied.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This matter involves an employment contract dispute between Plaintiff and his former employer, Spring Creek Holdings LLC ("Spring Creek" or "Defendant"). Dermo, a resident of Pennsylvania, is a business executive engaged in sales and marketing consultation in the food industry. (Am. Compl. ¶¶ 32, 33.) Defendant Jerry Issacson, a resident of Illinois, is the sole Chief Executive Officer ("CEO"), President, and controlling Manager-Member of Spring Creek, Dedicated Foods LLC ("Dedicated Foods"), and Target Foods LLC ("Target Foods") (collectively hereinafter "the LLC Defendants"). (Id. ¶¶ 7, 12, 18.) According to Plaintiff, all three companies are financially

and operationally intertwined with the same corporate address and employees. (Pl.'s Mot. Partial Summ. J., Ex. F, Aff. of Plaintiff Michael Dermo ("Dermo Aff.") ¶ 5.) Plaintiff avers that, during his term of employment, he performed work for all three corporations as a result of their interconnectedness. (Id.)

Prior to joining any of the LLC Defendants as an employee, Dermo served as the Senior Vice President of the well-known Gerber Foods® baby food line. (Def.'s Resp Opp'n, Ex. A, Decl. of Jerry Isaacson ("Isaacson Decl.") ¶ 1.) In July of 2010, Isaacson hired Dermo to perform full-time consulting services for Target Foods through September of 2010. (Pl.'s Reply ("Reply"), Ex. 2, 07/22/10 Consulting Agreement ("Consulting Agreement") ¶ 5.) The Consulting Agreement was subsequently extended until December 31, 2010. (Reply, Ex. 3, Extension of Consulting Agreement.)

Apparently as a result of Isaacson's satisfaction with Dermo's work for Target Foods, Isaacson hired Dermo for a full-time position as an Executive Employee of Spring Creek in January of 2011. (Pl.'s Mot. Partial Summ. J., Ex. B, Emp't Agreement.) According to the terms of his Employment Agreement with Spring Creek, Dermo was to receive a $264,000 per year base salary, six weeks of annual paid vacation time, a $600 per month car allowance, healthcare benefits, 2% acquired ownership of the company, and a sales-based bonus. (Id. ¶ 4.) The Employment Agreement further guaranteed Dermo an initial employment term of two years, subject to renewal for additional one-year terms upon the mutual written consent of the parties. (Id. ¶ 2.)

In regard to termination, the Employment Agreement stated that: "Executive's employment hereunder may be terminated at any time upon written notice by the Company or Executive, with or without cause." (Id. ¶ 7(a).) The contract defined "cause," in relevant part, as:

2

> [F]ailure by Executive to perform in any manner under this Agreement after being given notice of such failure by the Company, along with an explanation of such failure of performance.

(Id. ¶ 7(f)(i).) According to the terms of the Employment Agreement, if Dermo was fired *for* cause, he was entitled to "written notice of the violation and a reasonable opportunity to cure the same to the Company's satisfaction." (Id.) The Agreement further provided that, in the event of termination *without* cause, Dermo would nonetheless receive his: (1) accrued but unpaid base salary and vacation/sick pay, (2) severance pay, (3) bonus, and (4) reimbursement for out-of-pocket expenses. (Id. ¶ 7(c).)

Between January and August of 2011, Plaintiff conducted sales and marketing consultation services in Pennsylvania pursuant to the terms of the Employment Agreement. (Dermo Aff. ¶ 8; Am. Compl. ¶ 44.) Specifically, he worked primarily out of his home office in Plymouth Meeting, Pennsylvania to oversee the product development and distribution of the companies' frozen fruit bar and baby food lines during this time. (Id. ¶ 45; Isaacson Decl. ¶ 6.) Plaintiff also conducted weekly Skype[1] calls with Isaacson in Illinois to discuss the progress of his work. (Am. Compl. ¶ 47.) According to Dermo, the company's revenues from frozen fruit bar sales doubled in 2011 as a result of his work on the account. (Dermo Aff. ¶ 11.)

Defendant, on the other hand, contends that Plaintiff did not meet his expected job potential during this time. (Isaacson Decl. ¶¶ 10–12.) More specifically, Isaacson, the CEO of Spring Creek, avers that Dermo was hired for the specific purpose of generating revenue in the area of baby foods,

---

[1] Skype© is an online software service that allows individuals to interactively communicate through voice and video over the Internet. See SKYPE, http://about.skype.com/ (last visited Aug. 17, 2012).

3

but failed to obtain even one baby food account during his eight months with the company. (Id.) Defendant further alleges that Plaintiff had serious performance problems during his term of employment at Spring Creek. (Id. ¶¶ 12, 13.)

Dermo contends that, despite his substantial generation of revenue, the LLC Defendants were inadequately capitalized throughout his employment. (Dermo Aff. ¶ 24.) More specifically, Defendants had outstanding debts, totaling over $115,000, that they owed to several other corporations. (Id. ¶ 33.) In order to raise capital, Isaacson began to negotiate with a private equity firm for a substantial investment. (Id. ¶ 26.) According to Dermo, it was well known that obtaining this investment "was essential to Defendants' ability to finance their ongoing business commitments and debts, and to accomplishing their projected operations in 2012." (Id. ¶ 27.) Unfortunately, the investment deal foundered in August of 2011. (Id. ¶ 28; Pl.'s Mot. Partial Summ. J., Ex. G, 08/15/11 Isaacson E-mail Re: Juggernaut Capital ("Investment E-Mail").) That same day, Isaacson allegedly called Dermo and told him that his investors had advised him that he would need to "cut his payroll" in order for the corporations to stay afloat. (Dermo Aff. ¶¶ 28, 29.)

One day later on August 16, 2011, Isaacson orally terminated Dermo's employment position with Spring Creek. (Id. ¶ 30.) Plaintiff believes that he was terminated without cause. Dermo further alleges that he never received any type of written communication from Spring Creek giving him notice or stating why his position was terminated. (Pl.'s Reply at 6.) Plaintiff also avers that he was never provided with a reasonable opportunity to cure any alleged deficiencies on his part, as was required by his contract. (Pl.'s Mot. Partial Summ. J. at 11.) As such, Plaintiff claims that Defendant owes him the accrued salary, severance pay, and benefits as defined by the Employment Agreement. (Am. Compl. ¶ 49.)

Plaintiff initiated the instant action by filing a Complaint in this Court on October 18, 2011. Plaintiff thereafter filed an Amended Complaint on January 11, 2012, asserting various claims against Isaacson, Spring Creek, Dedicated Foods, and Target Foods. Specifically, the Amended Complaint includes the following seven counts: (1) breach of contract against Isaacson and Spring Creek (Count I); (2) unjust enrichment against Isaacson and Spring Creek (Count II); (3) promissory estoppel against Isaacson and Spring Creek (Count III); (4) promissory estoppel against Isaacson and Dedicated Foods (Count IV); (5) unjust enrichment against Isaacson and Dedicated Foods (Count V); (6) promissory estoppel against Isaacson and Target Foods (Count VI); and (7) unjust enrichment against Isaacson and Target Foods. On July 10, 2012, Plaintiff Dermo filed the instant Motion for Partial Summary Judgment Against Defendant Spring Creek, seeking summary judgment in his favor on Count I of his Amended Complaint on the issue of Spring Creek's alleged breach of contract. Defendant filed a Response in Opposition on July 30, 2012, and Plaintiff replied on August 1, 2012. Defendant thereafter filed a Sur-reply on August 7, 2012. Motion practice on this specific issue has now concluded, making it ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide

which is more probative, or to make credibility determinations. Boyle v. Cnty of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.  Summary judgment may be granted when "the evidence is merely colorable . . . or is not significantly probative." Id. at 249–50 (citations omitted).

**III.   DISCUSSION**

Plaintiff has moved for summary judgment to be entered in his favor on his breach of contract claim against Defendant Spring Creek. In order to succeed on his claim, Dermo must prove: (1) the existence of a valid and enforceable contract, (2) his substantial performance of the contract, (3) a breach by Defendant, and (4) resultant damages. See TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc., 491 F.3d 625, 631 (7th Cir. 2007).[2] Moreover, "[c]ourts are not authorized to make contracts for the parties, but must construe them as written, and where plain, common words are used in their ordinary meaning, they must be accepted in that sense." See Shell Oil Co. v. Manley Oil Corp., 124 F.2d 714, 714 (7th Cir. 1941) (interpreting Illinois contract law). Directly relevant to the instant dispute is the third factor of the contractual analysis, *i.e.*, whether Spring Creek's conduct in this case equated to a breach of the Employment Agreement.

Here, Plaintiff contends that there is no genuine issue of material fact that Spring Creek breached its Employment Agreement with him. More specifically, Dermo was guaranteed two years of initial employment under the Employment Agreement, but was terminated after only eight months with the company. Dermo avers that he was terminated without cause, and that he was never provided with any written notice of his termination as was required by the contract. As such, Plaintiff asserts that he is entitled to his outstanding accrued salary, severance pay, bonus, and reimbursement for expenses he incurred while at the company. In response, Defendant alleges that it did, in fact, have cause to terminate Dermo because he failed to meet his expected job potential.

---

[2] The Court applies the law of the Seventh Circuit because the Employment Agreement at issue provides that Illinois law governs any contractual dispute arising from its interpretation. (See Emp't Agreement ¶ 15 ("This Agreement shall be governed in all respects by the laws of the State of Illinois, without application of the conflict of laws principles thereof.").)

Defendant further alleges that Dermo received subsequent written affirmation of his termination in the form of post-termination e-mails written by Isaacson.

The Court first considers if any genuine issue of material fact remains regarding whether Plaintiff was terminated without cause. Under the terms of the Employment Agreement, "cause" is defined as a "failure [ ] to perform in any manner under this Agreement after being given notice of such failure by the Company, along with an explanation of such failure of performance." (Emp't Agreement ¶ 7(f)(i).) In the event that Dermo was terminated without cause, the contract provides that he would nonetheless be entitled to his accrued but unpaid salary and vacation/sick pay, severance pay, bonus, and reimbursement for incurred expenses. (Id. ¶ 7(c).)

Defendant asserts that it had cause to terminate Dermo because "he did not generate any revenue and had other performance problems." (Def.'s Resp. Opp'n 8.) More specifically, Spring Creek hired Dermo for the precise purpose of developing a baby food line at the company. According to Isaacson, Dermo represented to him during the interview process that he "had tremendous connections in the baby food business" as a result of his previous employment at Gerber Foods, and he assured Issacson that he would therefore be able to generate a substantial amount of revenue for the company in this area. (Isaacson Decl. ¶ 3(b–c).) In his eight months with Spring Creek, however, Dermo failed to obtain a single client account in the baby food line. (Id. ¶ 12.) Moreover, rather than bringing in significant money to the firm as promised, Dermo "lead [*sic*] the company astray with numerous stalling tactics and dead end projects . . . for which there was no clear purpose in contracting for." (Id.) Defendant further avers that Dermo did not work well with others, harbored a "desire to undermine [the] authority of other employees," and "fabricated the details of certain customer accounts." (Id. ¶ 13.) Defendant's sole support for its assertions is the Declaration

8

of its CEO, Isaacson.

On his part, Plaintiff asserts that Defendant's proffered reasoning for his termination is a ruse. Dermo maintains that, to the contrary, the evidence of record indicates that he brought substantial revenue in to the company and that Isaacson repeatedly expressed satisfaction with his job performance, thanking and congratulating him on his hard work. (Pl.'s Partial Mot. Summ. J. 12–13.) For example, Plaintiff points to statements made by Isaacson in numerous e-mails exchanged with him during the eight months of his employment:

> "I asked Barry and Howard to have drafts done by Sunday night. I knew you would be way ahead of the curve. I have become accustomed to your professionalism."

(Pl.'s Mot. Partial Summ. J., Ex. I, 02/12/11 E-Mail Re: SCH Brief.)

> "This looks very well done . . . "

(Id., Ex. J, 02/17/11 E-mail Re: SCH Brief-completed.)

> "You're are [sic] good partner. I told you when we started this would be an adventure and you would use all your years of experience and success in new ways. Very happy to be working with you."

(Id., Ex. K, 02/24/11 E-Mail Re: Thanks.)

> "Nice email!! Really. Regards, Jerry Isaacson."

(Id., Ex. L, 03/11/11 E-Mail re: Bus. Status & Agenda for Monday's Call.) Isaacson continued to acknowledge Dermo's good work after his termination from Spring Creek, telling him in an e-mail that, even though he would not be "going forward" with the company, Isaacson intended to contact Dermo's former clients to let them know "how disappointed" he was and that he "valued all [of Dermo's] significant contributions" to the account. (Id., Ex. H, 08/19/11 E-Mail Re: Planning Session.) Thus, according to Plaintiff, given Defendant's repeated affirmations of his good work,

9

it strains credulity to find that he was terminated for not meeting his expected job potential.

Rather, Plaintiff believes that the real reason for his termination was the company's failure to secure a much-needed investment. According to Plaintiff, during his term of employment, it was well known that the Defendant LLCs were inadequately capitalized and harbored substantial debt. (Dermo Aff. ¶¶ 22–25.) In order to obtain much-needed capital, Isaacson entered into negotiations with a private equity firm in an attempt to secure an investment between $6 million and $8 million. The investment deal unfortunately never came to fruition. (Id. ¶¶ 26–28.) Thus, Dermo maintains that he was terminated because the company could not satisfy its outstanding debts and ongoing business commitments—including his salary—without the investment. To support his purported theory of termination, Dermo points to an e-mail written by Isaacson only one day prior to his termination, in which Isaacson informed several company employees about the failure to obtain the essential investment. (Investment E-Mail.) Dermo also avers that Isaacson personally called him that same day to inform him that he had been advised by his investors to "cut his payroll" as a result of the failure to secure the capital needed from the investment deal. (Dermo Aff. ¶¶ 28–30.)

Although Dermo's purported reasoning for his termination is certainly credible, it is not the Court's role at the summary judgment stage to make credibility determinations. See Boyle v. Cnty of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (internal citations omitted). Rather, the Court's sole duty at this stage of the proceedings is to assess all the evidence before it in the light most favorable to the non-movant—in this case, Spring Creek—and to draw all justifiable inferences in that party's favor to determine whether any genuine issues of material fact remain based on the record. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (internal citations omitted) . The Court notes that the discovery period has not yet closed in this

case. In fact, the parties have not even engaged in either depositions or written discovery. It is possible that further discovery leading up to trial may bear out additional evidence on the issue of whether Isaacson was terminated without cause. Given the presently scant evidentiary record on this point, the Court cannot conclusively state at this time that Defendant did not have cause to terminate Plaintiff's employment position.

In any event, even if the Court could find that Defendant terminated Plaintiff with or without cause, it still must consider whether Plaintiff was given appropriate written notice of his termination. Illinois contract law provides that, "[t]he interpretation . . . of a contract is a question of law to be determined by the court under Illinois law." Cromeens, Holloman, Sibert, Inc v. AB Volvo, 349 F.3d 376, 395 (7th Cir. 2003). Section 7(a) of the Employment Agreement at issue provides as follows: "Executive's employment hereunder may be terminated at any time *upon written notice* by the Company or Executive, with or without cause." (Emp't Agreement ¶ 7(a) (emphasis added).) In affording these words their "plain, ordinary meaning"—as is required under Illinois law, see Shell Oil, 124 F.2d at 714—the Court interprets this contractual provision to mean that Spring Creek was required to provide Dermo with written notice, regardless of whether his termination was with or without cause. Thus, it follows that, if Dermo was not given written notice of his termination, then Defendant breached this provision of the contract.[3]

On his part, Plaintiff contends that his employment with Spring Creek was orally terminated

---

[3] Plaintiff spends a significant portion of his briefing arguing that Spring Creek did not provide him with a reasonable opportunity to cure any alleged deficiencies as was required by the contract. The reasonable opportunity to cure requirement, however, only applies to a termination *with* cause. Given that the Court has already indicated above that, at this time, it is unable to determine whether or not Defendant had cause to terminate Plaintiff, it will refrain from addressing Plaintiff's arguments, and Defendant's responses thereto, based on Spring Creek's purported failure to provide Dermo with a reasonable opportunity to cure.

by Isaacson on August 16, 2011, and that he never received any form of written communication of his termination before or after this date. Defendant responds that it did in fact provide written confirmation of Plaintiff's termination in two e-mails sent to Dermo after he was fired. The first e-mail was written by Isaacson three days after Dermo's termination on August 19, 2011. In the e-mail, Issacson states:

> Thx for sending over. I understand that you have let some of the Crossmark people know that you won't be with the Company going forward. I am going to reach out to Ben Fisher, let him know how disappointed I am that we will be unable to pursue baby food and that I valued all your significant contributions.

(08/19/22 E-Mail Re: Planning Session.) Defendant presently contends that Isaacson's phrase "that you won't be with the Company going forward," serves as sufficient written notice of Dermo's termination. Defendant also points to another e-mail exchange between Isaacson and Dermo that took place on September 8, 2011. That e-mail exchange was as follows:

> Dermo to Isaacson: Since you are too busy and did not call me back like you said you would. The basic question is: When was the official day you laid me off[?] Was it on Tuesday Aug 16th which was the day you told me that I was laid off or was it Friday Aug 19th which was the day you told Margo and the date she told me and Joe or was it Friday Aug 12th since you did not pay me for the week of the 15th although you and I discussed business that Saturday the 13th and I was still sending you information and working with the week of the 15th. Just need to know the date Jerry so I can report it to PA unemployment office and this is a priority for me. Thanks[,] Mike.
>
> Isaacson to Dermo: Use the 15th.

(Def.'s Resp. Opp'n, Ex. E, 09/08/11 E-Mail Re: Per our call.) Thus, Defendant contends that the text of these two e-mails was sufficient to constitute written notice under the Employment Agreement.

The Court, however, cannot agree. The text of these e-mails and the precise context in which they were written is simply too ambiguous for the Court to definitively find that they constituted sufficient written notice of Dermo's termination. It remains unclear at this point in time how a reasonable juror would interpret the above e-mail communications. On the one hand, a factfinder could infer Isaacson's words—particularly in the latter September 8, 2011 e-mail—to be an affirmation of Plaintiff's termination from employment. In fact, Dermo appears to acknowledge as much in the e-mail through the use of phrases such as "When was the official day you laid me off[?]" (Id.) On the other hand, a reasonable juror could also find that the text and context of Issacson's e-mails are insufficient to constitute written notice under these circumstances. As an initial matter, it is worth mentioning that Isaacson did not initiate either of the above e-mails. Rather, his words were solely expressed in response to Plaintiff's own inquiries. In the context of employment terminations, written notice acknowledging termination is usually provided upon the employer's own initiative, and not in the form of off-hand, cursory statements made in response e-mails addressing different subject matter.

Moreover, the circumstances surrounding Dermo's employment position and termination were rather unique. Usually, when an employee is terminated from employment, his employer's Human Resources Department provides him with a termination packet including information related to—among other things—severance pay, unemployment benefits, and insurance. Typically, such a packet also includes a "pink slip," or letter detailing the terms of the employee's termination. No such termination letter was provided here. Admittedly, Dermo's conditions of employment with Spring Creek were not typical in the sense that he was an out-of-state executive that worked primarily out of his home office in Pennsylvania. Such unique factual circumstances give rise to

genuine issues of material fact related to how termination was communicated here.  As such, given this atypical employment termination scenario, it is best left to the discretion of a reasonable jury to ascertain whether the form of notice present here was sufficient under the Employment Agreement.

## IV.    CONCLUSION

For the aforementioned reasons, the Court finds that Plaintiff is not entitled to summary judgment in his favor on his breach of contract claim against Defendant Spring Creek.  Plaintiff's Motion is accordingly denied.

An appropriate Order follows.